# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | : | |
| HAROLD MYLES, individually and on behalf | : | |
| of other similarly situated individuals | : | |
| | : | |
| v. | : | Civil No. CCB-11-1234 |
| | : | |
| PROSPERITY MORTGAGE COMPANY | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM

Lead Plaintiff Harold Myles ("lead plaintiff" or "Myles"), a former loan officer for Prosperity Mortgage Company ("PMC" or "defendant"), has sued his former employer for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219.  Lead plaintiff brings suit on behalf of himself and those similarly situated, claiming that PMC misclassified loan officer employees as exempt from the overtime pay requirements of the FLSA and thus improperly denied them overtime pay when they worked over forty hours a week.  Eight additional current and former loan officers have consented to join the action.  Now pending before the court is a motion by the lead plaintiff for conditional collective action certification and court-approved notice under FLSA § 216(b).

Defendant contends the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011), applies to FLSA actions and thus the court should modify the traditional two-step analysis for collective actions under the FLSA.  Whether modified or not, defendants argue, the court should deny conditional class certification or significantly reduce the scope of the proposed class.  The issues have been fully briefed, and no hearing is necessary. See Local Rule 105.6.  For the reasons stated below, plaintiffs' motion for collective action certification will be denied in part

and granted in part.

## I.  <u>BACKGROUND</u>

PMC is a general partnership formed by entities of Wells Fargo and Long & Foster and headquartered in Chantilly, Virginia.  The company is engaged in the business of providing residential mortgage loans in seven states and the District of Columbia.  (Beckstead Decl. ¶ 2, ECF No. 26-1.)  For this purpose, PMC employs various—and possibly overlapping and informal— categories of loan officers, including home mortgage consultants, mortgage loan originators, independent loan officers, and reverse home mortgage consultants.  By PMC's estimate, it has employed approximately 378 individuals as loan officers during the past three years.  (Def.'s Opp. Brief 1, ECF No. 26.)

Through its partnership with Long & Foster, PMC aims to place at least one PMC loan officer in each Long & Foster real estate office within PMC's operating region.  A significant majority of PMC employees work out of Long & Foster offices and "are responsible for assisting Long & Foster customers with loan applications, as well as maintaining outside clientele." (Opp. 3.) The rest of PMC's employees work either from home or from "a PMC corporate office." (*Id*.) The company categorizes these employees who do not work from a Long & Foster office as either "independent" loan officers or "reverse home mortgage consultants." (Beckstead Decl. ¶ 5.)  Over the last three years, approximately 265 of PMC's current and former loan officers have worked out of Long & Foster offices, and approximately 133 current and former employees have worked from home or from PMC offices.[1]  All loan officers report to either a branch manager, sales manager, or

---

[1] Though defendant does not specify, presumably these two numbers do not add up to 378 because some current or former employees worked in both categories at some point during the last three years.

area manager.

Loan officers are the first contact point for PMC customers.  Without distinguishing between the various categories of loan officers mentioned above, PMC describes loan officers' responsibilities in the following way:

> PMC considers its loan officers the "face" of the Company because they are the customer's first contact with PMC.  Loan officers are responsible for assessing the borrower's financial condition, needs and goals, and then working with the borrower to identify loan options to best fit the particular customer situation.  To make this determination, they must interview applicants, review pertinent financial information (for example, the applicant's credit, income and collateral), and recommend loan options for the applicant that will likely be approved by a lender.

(*Id.* at ¶ 6.)

The main differences between the categories of employees described above were, and are, as follows.  Loan officers who work out of Long & Foster offices "generally rely on Long & Foster real estate agents for a significant portion of their loan origination business," though "PMC encourages [these officers] to develop 'outside' business by maintaining relationships within their communities," (*id.* at ¶ 4), and "[m]ost loan officers based in a Long & Foster location spend at least a portion of their day on 'outside business.'" (Opp. 4.)  On the other hand, for the independent loan officers and reverse home mortgage consultants who typically do not or did not work out of a Long & Foster office, "much more of their business has been 'outside business'" not connected to Long & Foster.  (*Id.*)[2]

> In addition to processing loans, their workdays are spent soliciting business and building relationships with real estate agents from different companies, attorneys, financial planners and other members of their communities in an effort to increase and close more loans outside the Long & Foster relationship.

(Beckstead Decl. ¶ 5.)  Reverse mortgage consultants "developed loans from existing homeowners

and no real estate agency was required for their work."  (*Id.* at ¶ 6.)[3]

   While PMC alleges that some responsibilities were different for different categories of loan officers, the company does not contend its compensation policy distinguished between the categories.  Prior to April 1, 2011, PMC classified "its loan officers" (presumably all of them) as exempt from the FLSA's minimum wage and maximum hour rules under the "outside sales" exemption delineated in 29 C.F.R. §§541.500–.504.[4]  (Opp. 5).  During this time PMC did not require loan officers to record their work hours and did not give overtime pay to employees who worked more than forty hours in a week.

   Rather, loan officers were paid on a commission basis.  The company's Senior Human Resources Business Partner describes the policy in the following way:

   Prior to April 1, 2011, PMC paid a few loan officers on a draw plus commission basis.  However, PMC paid the vast majority of loan officers on a draw against commission basis.  The latter basis worked as follows.  For a brief initial period, the loan officer typically was provided a guaranteed payment.  Thereafter, such loan officers developed with their supervisors, and were provided, a draw every 15th day and last day of the most, at a minimum of $1,000.  However, some loan officers negotiated for a higher draw, depending on their expected commissions.  Some very successful loan officers took a draw as high as $5,000, but most took draws in a range between $1,000 and $5,000.

   . . . PMC paid commissions at the end of each month, and after the initial period,

---

[2] PMC states that it stopped selling reverse mortgages in April 2011.

[3] Sales Managers and even some branch managers, like loan officers, also carried out some loan origination duties.  (*Id.* at ¶ 8.)  However, there is no need to detail their responsibilities, as lead plaintiff has clarified that he does not seek to include sales managers, branch managers, or area managers in the proposed class.  (Pl.'s Reply 3 n.1, ECF No. 29.)

[4] The outside sales exemption exempts those employed "in the capacity of outside salesman" from the FLSA's maximum hour and overtime pay rules.  29 U.S.C. 213(a)(1). FLSA regulations define the term "employed in the capacity of outside salesman" to mean:

   any employee (1) (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).  "[A]ny fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property."  *Id.* at § 541.502.

applied the commissions to cover the [loan officer's] draw.  In any given month, if a
loan officer did not earn enough in commissions to cover their draw, the amount
owed would "roll over," and PMC would cover it from the next month's
commissions.  Under PMC's draw against commission compensation plans and in
my experience, if the loan officer never received commissions greater than the draw,
PMC would not recover the draw upon termination.

(Beckstead Decl. ¶¶ 10–11.)  "Hence, the draw, practically speaking, functioned as a minimum

salary for PMC loan officers."  (Opp. 6.)

On April 1, 2011, PMC reclassified its loan officers to be non-exempt employees.  At this

time, the company switched from the draw and commission system to a hybrid hourly system,

maintaining a commission incentive.  PMC now pays each loan officer $12.00 per hour plus their net

earned commissions, "[w]ith a few exceptions at higher rates."  (Beckstead Decl. ¶ 13.)  And,

presumably, employees are paid the appropriate overtime rate for any hours worked in excess of the

forty hour statutory maximum.  On April 1, 2011, PMC began requiring its loan officers to record

their hours worked in an automated timekeeping system.  After doing so, the company has found that

some loan officers have worked over forty hours per week, though not every week.  Many loan

officers, however, "do not appear to need to work more than forty hours per week to meet their

production goals."  (*Id.* at ¶ 15.)  Nonetheless, defendant notes, "[l]oan origination is a market and

location-dependent business," causing workloads to "ebb and flow."  (*Id.* at ¶ 9.)  "Thus, in general,

loan officers work some 'overtime' each year, but not every week."  (*Id.*)

Lead plaintiff Myles worked for PMC as a loan officer from approximately June 2007 to

February 18, 2011, working out of a Long & Foster office in Mitchellville, Maryland.  Myles's title

was "home mortgage consultant," and PMC paid him on a "draw plus commission" basis.  Myles

alleges that he "was often required to work more than forty hours each week in order to reach the

production goals given to him by Defendant," (Compl. ¶¶ 17, 22, ECF No. 1), and that he "very

5

rarely met with customers outside of Long and Foster's office location." (Myles Decl. ¶ 9, ECF No. 24 Ex. 2.)  When he did meet with customers elsewhere, "it was usually to pick up documents or to obtain their signature after normal business hours." (*Id.*)

Myles filed this action on May 9, 2011, suing on behalf of himself and those loan officers "similarly situated."  Defendant filed an Answer on July 22, 2011, admitting that Myles and other loan officers were classified as exempt prior to April 1, 2011, and that as of that date they were reclassified as non-exempt employees. (ECF No. 15.)  Between May 11 and October 26, 2011, ten individuals signed consent forms to join the suit as opt-in plaintiffs.  The forms stated that "there were occasions" when they worked over 40 hours per week as loan officers for PMC within the previous three years.  Two of the opt-in plaintiffs subsequently withdrew their consent.

The eight remaining opt-in plaintiffs worked in Maryland, Virginia, West Virginia and Pennsylvania.[5]  Two of the opt-in plaintiffs, like Myles, worked in Maryland.  Four worked in Virginia, and one each worked in Pennsylvania and West Virginia. (Selander Decl. ¶ 4, ECF No. 29-1.)  Lead plaintiff has filed separate declarations for Myles and for four of the opt-in plaintiffs, Carol Stenglein and Glenn Watkins from Virginia, Carol Stewart from Maryland, and Cathy Westfall from West Virginia.  Of these four, Stenglein, Stewart, and Westfall—like Myles—worked out of Long & Foster offices.[6]  Watkins worked out of PMC's Virginia Beach office, and PMC notes that Watkins was an "independent" home mortgage consultant. (Opp. 8.)  There is no indication in the record as to whether the remaining four opt-in plaintiffs worked out of Long & Foster, PMC, or

---

[5] On September 23, 2011, at the time of filing of the motion for conditional certification, a total of six opt-in plaintiffs remained in the case.  On October 3, 2011, plaintiffs' counsel mistakenly filed the wrong consent form for Pennsylvania opt-in plaintiff Jeffrey Yearwood.  The correct form was filed on October 26, 2011.  Counsel also filed a notice of consent by opt-in plaintiff Joan Carter on October 24, 2011, bringing the current total of opt-in plaintiffs to eight.

[6] Of the four opt-in plaintiffs who filed declarations, only Westfall was, at the time of her declaration, still employed by PMC.

home offices.

Each of the five declarations filed, including the Myles declaration, alleges that the declarant "consistently worked more than forty (40) hours per week" to meet required production goals.  (Opp. 8.)  In addition, each declaration included the following information to explain their belief that their experiences were shared by all other PMC loan officers:

> Over the years I frequently discussed Prosperity's policies and loan products with other Loan Officers. I attended training sessions with other Loan Officers from various areas of the country. I often consulted with other Loan Officers about my work. Based on this, I am informed and believe that other Loan Officers were classified as exempt and performed the same job duties as me.

(*Id.*)  Two of the four opt-in plaintiff declarants, like Myles, stated that they rarely met customers outside of Long & Foster's office location, and Watkins alleges he rarely met with customers outside of his PMC office.  Westfall stated that she *never* met with customers outside of the Long & Foster office.

On September 23, 2011, lead plaintiff Myles filed a motion for conditional certification and judicial notice.  The motion requested the court certify for collective action "[a]ll persons who worked for Prosperity Mortgage Company as a loan officer at any time within three years of the date the Court grants this motion and April 1, 2011."  With the motion, the lead plaintiff submitted a proposed judicial notice, requesting the court approve the form, content, and plan for distribution, and requesting an order requiring PMC to produce a list of all persons employed by the company within the last three years.

PMC has filed a motion in opposition to conditional certification, and plaintiffs have filed a reply.  PMC also filed a motion for a surreply, and lead plaintiff filed a subsequent response.

## II. <u>DISCUSSION</u>

Under the FLSA, a collective action for unpaid overtime wages may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated.*" 29 U.S.C. § 216(b) (emphasis added). Section 216(b) provides "an 'opt-in' scheme whereby potential plaintiffs must affirmatively notify the court of their intention to become a party to the collective action." *Marroquin v. Canales*, 236 F.R.D. 257, 259 (D. Md. 2006). "To effectuate the remedial purpose of this act, it is well settled that district courts have the discretion, in appropriate cases, to allow such claims to proceed as a collective action and to facilitate notice to potential plaintiffs." *Id.* (citing *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000)).

"In deciding whether to certify a collective action under the FLSA, courts generally follow a two-stage process." *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010). The first stage, called the "notice stage," generally occurs before much, if any, discovery has taken place. At this time, the court makes a threshold determination of "whether the plaintiffs have demonstrated that potential class members are 'similarly situated,' such that court-facilitated notice to the putative class members would be appropriate." *Id.* (quoting *Camper*, 200 F.R.D. at 519). At the second step, following the conclusion of discovery, "the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Id.* (quoting *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007)).

Here, at the first stage, lead plaintiff must "make a preliminary factual showing that a similarly situated group of potential plaintiffs exists." *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 771 (D. Md. 2008) (internal quotation marks and citations omitted). While the

plaintiff need only put forward "relatively modest" evidence at this stage, *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995), "mere allegations in the complaint would not suffice." *Quinteros*, 532 F. Supp. 2d at 772.  A successful showing often consists of a demonstration that "they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 564 (E.D. Va. 2006); *see Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part*, 862 F.2d 439, 444 (3d Cir.1988), *aff'd*, 493 U.S. 165, 110 S. Ct. 482, 107 L.Ed.2d 480 (1989) (noting that, with initial collective action certifications under § 216(b), "courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan").  "When sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, however, a court can . . . deny certification outright." *Purdham v. Fairfax Cnty. Pub. Sch.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009).

### A.  Effect of *Wal-Mart Stores v. Dukes*

As an initial matter, PMC contends the court should modify the FLSA traditional two-step analysis in light of the U.S. Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  *Dukes* was an employment discrimination case decided under Rule 23 of the Federal Rules of Civil Procedure, which differs from the FLSA collective action mechanism employed by lead plaintiff here.  PMC argues that "the principles announced by the Supreme Court [in *Dukes*] pertain to all aggregate claims," including Myles's claim, (Opp. 10), but *Dukes* does not mention the FLSA or the two-step certification process, and such a conclusion does not necessarily follow from any particular language in the opinion.  *Mitchell v. Acosta Sales, LLC*, --- F. Supp. 2d ----, 2011 WL 7068384 at *9 n.2 (C.D. Cal. Dec. 16, 2011) (stating that the court was "not persuaded

that [*Dukes*] alters the first-tier inquiry for FLSA certification decisions" because, in part, "[n]either [*Dukes*] itself nor the three district court cases cited by Defendants held as much").

In general, courts have been circumspect about importing interpretations of Rule 23 class action requirements into FLSA collective action cases. *See, e.g., Essame v. SSC Laurel Operating Co.*, --- F. Supp. 2d ----, 2012 WL 762895 at * 6 (D. Md. Mar. 12, 2012) ("Because of the special policy considerations that the FLSA comprehends, Rule 23 standards are generally inapplicable to FLSA collective actions."); *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009) (noting that Congress could have, but did not, import "the more stringent criteria for class certification under Fed. R. Civ. P. 23" into the FLSA); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996) (holding that FLSA collective action requirements "are independent of, and unrelated to, the requirements for class action under Rule 23"); *LaChapelle v. Owens Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975) (holding that Rule 23(c) "opt-out" and § 216(b) "opt-in" actions are "mutually exclusive and irreconcilable").

As a result, "numerous courts . . . have refused to apply *Dukes* on motions for conditional certification under the FLSA, concluding that the Rule 23 analysis had no place at this stage of the litigation." *Winfield v. Citibank, N.A.*, --- F. Supp. 2d ----, 2012 WL 423346 at *10 (S.D.N.Y. Feb. 9, 2012) (listing cases); *Essame*, 2012 WL 762895 at * 6; *Ware v. T-Mobile USA*, --- F. Supp. 2d, 2011 WL 5244396 at *6 (M.D. Tenn. Nov. 2, 2011) (rejecting the argument that *Dukes* "trumps the Sixth Circuit's *O'Brien* decision").

In any case, even if it were proper to import Rule 23 standards into an FLSA case, the decision in *Dukes* does not suggest conditional certification is inappropriate here. The crux of the Court's problem in *Dukes* was that plaintiffs did not allege "any express corporate policy" of

discrimination.  *Id.* at 2548.  Rather, the injury at issue depended on the actions of individual

managers exercising discretion at a local level.  As a result, the Court stated, it was "impossible to

say that examination of all the class members' claims for relief will produce a common answer to the

crucial question *why was I disfavored*."  *Id.* at 2552 (emphasis in original).  Here, on the other hand,

PMC has acknowledged that it had an *express* policy of considering its loan officers to be exempt

under the FLSA; thus, no local management discretion is at issue and no individualized inquiry is

necessary to determine why individual loan officers were disfavored.  *See Nehmelman v. Penn Nat.*

*Gaming, Inc.*, 822 F. Supp. 2d 745, 756 (N.D. Ill. 2011) (distinguishing *Dukes* in an FLSA wage and

hour collective action case for many reasons, including that "there was no similar policy of

discretion" in the FLSA case); *see also Espinoza v. 953 Assocs. LLC*, --- F.R.D. ----, 2011 WL

5574895 at *11 (S.D.N.Y. Nov. 16, 2011) (finding *Dukes* "distinguishable" from a wage and hour

and overtime case brought pursuant to Rule 23).[7]

### B.  Conditional Certification

Turning back to the first stage of the two-step FLSA inquiry, the court determines that lead

plaintiff has met the threshold burden to afford conditional certification and notice as to the category

of loan officers working out of Long & Foster offices.[8]  Lead plaintiff has not, however, met this

---

[7] Judge Scheindlin's analysis is worth quoting at length:
> Although plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages that each employee is owed, not to the common question of Defendants' liability. Plaintiffs have alleged a common injury that is capable of class-wide resolution without inquiry into multiple employment decisions applicable to individual class members. Accordingly, [*Dukes*] is distinguishable and does not preclude class certification . . . .

*Espinoza v. 953 Associates LLC,* --- F.R.D. ----, 2011 WL 5574895 at *12 (S.D.N.Y. Nov. 16, 2011).

[8] In so holding, the court does not conclude that PMC loan officers *in fact* were not exempt, rather only that lead plaintiff has adequately alleged that the PMC policy violated the law.  Determination of the merits of this argument is made at a later date.  At this "preliminary stage, . . . the court does not weigh the merits, resolve factual disputes or make credibility determinations."  *Essame*, 2012 WL 762895 at *3 (quoting *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d

burden for loan officers working from home and out of PMC offices as "independent" or "reverse mortgage" loan officers.

The core question for conditional certification and notice is whether the plaintiffs have made the required preliminary factual showing that a "similarly situated" group of potential plaintiffs exists. *Quinteros*, 532 F. Supp. 2d at 771 (citing *Camper*, 200 F.R.D. at 519). In addition, PMC argues, the court should also consider the question of "manageability" when considering whether conditional certification is appropriate. The answers to these questions are left to the sound discretion of the district court. *Syrja*, 756 F. Supp. 2d at 689–90. However, in reaching its answers, the court should be guided by the remedial purpose of the FLSA. *See Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (discussing the need to apply the FLSA broadly to effectuate its remedial purpose).

PMC argues that independent and reverse mortgage loan officers working from home and from PMC offices are not similarly situated to Long & Foster-based loan officers because the independent and reverse mortgage loan officers "more clearly" meet the FLSA outside sales exemption. The relevant clause in the FLSA regulation requires employees classified as exempt as "outside salesman" to be "customarily and regularly engaged away from the employer's place or places of business in performing [their] primary duty." 29 C.F.R. § 541.500(a). Thus, as PMC correctly notes, a key factual issue is the amount of time each loan officer spent outside their regular office location. (Opp. 19.) PMC argues that the independent and reverse mortgage loan officers had to spend "more time outside the office meeting with customers and forming relationships," (*id.* at 9), and therefore that they are more likely to meet the outside sales exemption and thus are not similarly

200, 205 (N.D.N.Y. 2009)).

situated to the Long & Foster-based loan officers.

Plaintiff argues that it is sufficient that all loan officers were categorized as exempt and had the primary duty of selling loans. The court cannot agree. Potential plaintiffs will generally be considered similarly situated when, collectively, they "were victims of a common policy or scheme or plan *that violated the law*." *Marroquin*, 236 F.R.D. at 260 (emphasis added). Classifying loan officers as exempt, without more, does not violate the law. Rather, such a classification violates the law only to the extent that the officers did not meet the exemption requirements in the appropriate FLSA regulation. PMC does not dispute that all loan officers had the primary duty of selling loans, so the relevant fact is the amount of time spent outside the office. Yet the only evidence lead plaintiff provides regarding the amount of time independent loan officers spent outside the office is the single declaration of opt-in plaintiff Watkins, who alleges that he—like the Long & Foster-based officers—"very rarely" met customers outside of the PMC office where he was based. (Watkins Decl. 2, ECF No. 24 Ex 2.) This declaration, however, is unspecific, contradicted by PMC, and not corroborated by any other evidence. Lead plaintiff provides no evidence at all regarding reverse mortgage loan officers or loan officers who worked from home. As a result, lead plaintiff has met the conditional certification burden only for a class of loan officers who worked out of Long & Foster offices.

PMC also argues that conditional certification should be limited to those states in which declarants worked. In support of this argument, PMC cites this court's decision in *Andrade v. Aerotek, Inc.*, 2009 WL 2757099 at *5 (D. Md. Aug. 26, 2009). *Aerotek*, however, is inapposite. In that case, Aerotek had no express policy of denying overtime to employees; thus the court was unwilling to take the informal and off-the-book policies alleged to exist in two offices and

extrapolate them to the rest of the company's 150 nationwide offices.  The situation is different in this case, where PMC has admitted it categorized *all* loan officers as exempt and there is evidence that *all* Long & Foster-based loan officers rarely met with clients outside the office.  Declarants have alleged that they spoke with employees from other states at various training and other meetings about the company's policies.  Based on these conversations, plaintiffs allege that employees in other states had the same job duties, and PMC has not argued to the contrary.  Thus, the court declines to limit the proposed class by geography at this conditional stage.  *Cf. Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 631 (W.D. Wis. 2009) (holding that a plaintiff seeking certification for a company-wide class action "should not be required to collect specific violations from each location or from each state before seeking authorization to provide notice to employees from all locations").

Finally, PMC argues that conditional certification should be denied, even for a proposed class limited to Long & Foster-based loan officers, because even this limited class would be unmanageable.  Whether a proposed class is "manageable" is generally considered at the second stage of an FLSA collective action, but a court may in its discretion consider the question at the first stage as well.  *Syrja*, 756 F. Supp. 2d at 689–90.  In this case, however, it is too soon to determine that a proposed class of Long & Foster-based loan officers would not be manageable.

To support its manageability argument, PMC contends the flexible draw and commission compensation system meant that "each loan officer's draw was unique to their needs and expected commissions."  (Opp. 5.)  And while individuals worked different hours based on the location-specific flow of work in their specific office, (*id.* at 9), PMC did not keep track of hours worked prior to April 1, 2011, and "does not have a precise way to recreate" this information.  (*Id.* at 6.)  Thus, the company argues, any determination of the amount of overtime hours each plaintiff

worked—and therefore the determination of back pay due—would require an intensive and inaccurate individualized inquiry.

At this stage in the litigation, however, PMC's argument is not persuasive.  The parties have not briefed the question of how the base salary of employees should be determined, but it is not immediately clear why a calculation of an hourly wage based on a draw amount would be complicated or would require anything approaching an individualized inquiry.  And, with regard to the hours worked, PMC acknowledges that "in general, loan officers work some 'overtime' each year." (*Id.* at 9.)  Thus, if the company had recorded employees' hours, no individualized inquiry would be necessary at all.

The real difficulty here is that PMC did *not* in fact record employees' hours, thus potentially necessitating a more imprecise and individualized review of employee's work product.  At this point, however, the parties have yet to flesh out proposals for an appropriate methodology, and it may be difficult to do so without at least some discovery.  Until then, therefore, the court is disinclined to preemptively rule that the proposed class is unmanageable, especially where the size of the class is already limited.[9]

In sum, lead plaintiff has provided sufficient evidence for the court to conditionally certify a class of loan officers who—like lead plaintiff—worked out of Long & Foster offices.  Another district court within the Fourth Circuit has noted that plaintiffs' "situations need not be identical" for two individuals to be considered similarly situated.  *De Luna-Guerrero v. North Carolina Growers' Ass'n, Inc.*, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quoting Ellen C. Kearns, *The Fair Labor*

---

[9] Additionally, the Supreme Court has emphasized that where an employer does not have records of the employee's hours, courts should not "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). Thus, to the extent any necessary individualized inquiry here results from PMC's failure to keep records, this fact

*Standards Act*, § 18.IV.D.3 (1999)).  Rather, plaintiffs may be similarly situated when they "raise a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions . . . ."  *Id.*  I agree, and I find lead plaintiff's allegations and evidence to be sufficient under this formulation.

### C.  Notice and Information Disclosure Request

Lead plaintiff has provided the court with a draft of the notice document to be distributed to the class that is conditionally certified by the court, and lead plaintiff has requested the court order PMC to produce to plaintiffs' counsel a list in Microsoft Excel format of all persons within the proposed class and each employee's full name, last known address, social security number (last four digits only), employee identification number, and dates of employment as a loan officer.

PMC has objected to the disclosure of any information beyond the name and address of each employee.  In response lead plaintiff argues that the last four digits of an employee's social security number will facilitate determination of her current address in the event the last known address is incorrect.  Lead plaintiff has also suggested a compromise whereby defendant will retain the last four digits of employees' social security number, but agree to provide them to plaintiffs' counsel on a case-by-case basis in the event that any notices cannot be delivered.  The court finds this compromise, applied equally to social security numbers and employer identification numbers, will permit disclosure only where justified and therefore is proper under the circumstances.  *Cf. Lynch v. United Services Auto. Ass'n,* 491 F. Supp. 2d 357, 372 (S.D.N.Y. 2007) (ordering defendants to produce, among other information, the last four digits of employee's social security numbers);

---

should weigh against dismissal of or further limitations on plaintiffs' action.

*Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 215 (S.D. Ohio 2011) (finding plaintiffs had "failed to justify their request for employees' telephone numbers, social security numbers (last four digits), and employee identification numbers"). The court finds reasonable the request for disclosure of the dates during which employees were potential members of the conditionally certified class.

PMC requests the opportunity to be heard separately with respect to the scope, content, and method of distribution of the notice. This request, however, contains no specific concerns about the notice or justifications for additional briefing. The request will therefore be denied. Instead, the court will require lead plaintiff's counsel to submit an amended notice, after consultation with defense counsel, to be followed by a conference call with chambers to discuss any remaining issues as to the form of the notice or disclosure of information.

### D.  Motion for Leave to File Surreply

Finally, PMC has filed a motion for leave to file a surreply in regard to the motion for conditional certification and notice. Local rules do not permit the filing of surreply memoranda unless specifically ordered by the court. See Local Rule 105.2(a). Such an order is appropriate where "the moving party would be [otherwise] unable to contest matters presented to the court for the first time in the opposing party's reply." *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467 (D. Md. 2008) (internal quotations and citation omitted). Lead plaintiff's reply memorandum contains citations to case law that do not appear in the original motion, but it does not contain any new factual allegations or arguments not already presented to the court. Therefore, defendant's motion will be denied. *See Gilbert v. Bangs*, 813 F. Supp. 2d 669, 678 (D. Md. 2011) (denying motion for leave to file surreply in response to "extensive case law" where

the issues in reply brief had already previously been raised).  *Cf. U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 2d 270, 277 (D.D.C. 2002) (expressing "doubts that the existence of statutory or case law can ever be 'new matter' so as to permit the filing of a surreply").

### III. CONCLUSION

For the reasons explained above, the court will conditionally certify a class of all persons who worked for Prosperity Mortgage Company as a loan officer based in a Long & Foster office at any time between May 31, 2009 and April 1, 2011.  Lead plaintiff will be required to submit an amended notice form and information disclosure request, and defendant's motion for leave to file a surreply will be denied.

A separate order follows.


___May 31, 2012___                                    _____/s/_____
Date                                                               Catherine C. Blake
                                                                      United States District Judge

18